**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| INTELLECT WIRELESS, INC., | |
| Plaintiff, | Case No. 1:09-cv-02945 |
| v. | Honorable Judge William T. Hart |
| HTC CORPORATION and HTC AMERICA, INC., | Magistrate Judge Geraldine Soat Brown |
| Defendants and Counter-Claimants. | |

**<u>DEFENDANTS HTC CORPORATION AND HTC AMERICA, INC.'S
MOTION FOR ENTRY OF JUDGMENT</u>**

HTC Corporation and HTC America, Inc. (collectively, "HTC") hereby move for entry of judgment against Raymond P. Niro, Paul K. Vickrey, David J. Mahalek, and Paul C. Gibbons (collectively, "Niro"), Intellect Wireless, Inc. ("IW"), and Daniel A. Henderson, individually, based on the Court's January 8, 2015 Opinion and Order (the "Court's Order") and the Court's June 12, 2014 Minute Entry declaring the case exceptional. Specifically, the Court should enter judgment against Niro, IW, and Henderson jointly and severally for $4,098,886.40 for attorneys' fees and costs.

**I.      <u>Introduction</u>**

For almost four months following the Court's recommendation, HTC has diligently attempted to resolve this case. After adjusting its original $4.8 million request for fees, pursuant to the Court's Order, IW and Niro owe HTC $4,098,886.40 in fees and costs. At one point, HTC was willing to accept less than this amount if the parties could reach settlement. However, IW has failed to make a single settlement offer to HTC and has refused to pay HTC's fees. Niro has

failed to do much better. It took three months for Niro to make its first settlement offer. Yet, that offer—$1,480,000—is only one-third the amount owed under the Court's Order. IW and Niro are not serious about settling this case.

Should the Court need to enter judgment, the Court ordered the parties to attempt to agree on the final amount of fees and costs to be paid to HTC. Unable to reach any resolution on the amount of fees, it is now necessary to bring these issues back to the Court. Although the parties have resolved many differences, three remain. Most notably, Niro and IW have: (1) failed to account for HTC's fees incurred during the last six months, (2) refused to include prejudgment interest, and (3) wrongfully excluded a significant number of costs that are due to HTC. In contrast to HTC's $4,098,886.40 calculation, Niro estimates the fees and costs due to HTC at $3,606,895.04. Thus, the parties are approximately $492,000 apart in their respective calculations. Below, HTC has set forth its detailed calculations and explains why Niro's calculation is fundamentally flawed and inconsistent with the Court's Order.

Finally, HTC requests the Court pierce the corporate veil and hold Henderson personally liable for IW's debts. Henderson, the patent inventor, formed IW as a shell corporation to enforce his fraudulently obtained patents. He set himself up as the CEO, ignored all corporate formalities, and syphoned a staggering 98% of the profits of the settlements obtained from his lawsuits directly to his personal bank accounts. Despite collecting nearly $25 million, IW has repeatedly represented to HTC that it cannot satisfy any portion of HTC's attorneys' fees and costs. IW has also repeatedly taken the position that only IW, and not Daniel Henderson individually, is jointly and severally liable for HTC's fees and costs. By design, Henderson left IW incapable of paying any debts, including the fee award in this case. Thus, HTC respectfully requests the Court to hold Daniel Henderson jointly and severally liable for HTC's fees and costs.

## II.     The Parties Failure to Reach a Settlement Over the Last Three Months Necessitates Entry of Judgment

### A.     Efforts to Settle the Case

HTC has repeatedly attempted to settle the case with Niro and IW since the Court issued its order in January.  However, HTC has been frustrated by Niro and IW's lack of urgency and unwillingness to offer any reasonable settlement.  At the end of February, Niro first proposed that all of the parties attend mediation.  IW would not even agree to attend.  (Ex. 4 at 3.)  When HTC attempted to follow through on Niro's suggestion to mediate, Niro backed out.  More specifically, HTC and Niro agreed to mediate in San Diego during the ***latter part*** of the week of April 13-17, 2015.  (Ex. 5 at 4–5.)  When HTC proposed the last two days of that week (i.e., April 16 and 17), Counsel for Niro reneged, stating, remarkably, that he "had not checked with my guys" about their availability to attend mediation during that week.  (Ex. 6.)

Shortly thereafter, it became abundantly clear to HTC that Niro and Henderson were fighting amongst themselves as to who should pay HTC's fees.  On April 15, 2015, Henderson and IW sued Niro in Illinois state court for declaratory judgment that Niro cannot force Henderson and IW into arbitration over the fee award in this case.  (Ex. 7 at 1–11.)  The complaint alleges Niro is demanding that IW pay at least 60% of the award to HTC.  (*Id.* at 5–6.)  The Court held the parties jointly and severally liable and HTC should be allowed to pursue the full judgment against any party, or all parties.  Absent a judgment, HTC is unable to collect the full amount due under the Court's Order.

### B.     Efforts to Narrow the Issues for Entry of Judgment

Following the Court's January 8 Order, the Court expected the parties to meet and confer within one week to try and reach final agreement on an amount of fees and costs due to HTC.  (Dkt. 343 at 28.)  Finally, on February 5, 2015, four weeks after the Court's Order and only after

HTC threatened to raise Niro and IW's lack of cooperation to the Court, Niro provided its calculations totaling approximately $3 million in fees and costs. (Ex. 11 at 1; Ex. 12 at 2–3.) HTC immediately pointed out the numerous flaws in Niro's calculations. (Ex. 12 at 1.) The same day, HTC also provided its responsive calculations for fees and costs, which were approximately $4 million. (Ex. 12 at 1.) Thus, at this time, the parties were approximately $1 million apart in their respective calculations.

On February 24, recognizing its errors, Niro provided HTC with updated calculations, but only as to costs. (Ex. 13.) However, these costs were still grossly underestimated. Finally, on March 11, Niro revised its total fee and cost calculations under the Court's Order to approximately $3.6 million. (Exs. 14–15.) This narrowed the parties' dispute substantially. However, Niro's calculations are still flawed because they: (1) fail to include HTC's fees since September 2014, (2) fail to include pre-judgment interest, and (3) improperly exclude a significant amount of costs that the Court awarded (e.g., Niro calculated costs at $170,000 less than the costs it conceded were appropriate in its briefing on attorneys' fees and costs). (Exs. 15 at 4–6.) Given the parties continued disagreement, and Niro's failure to object to HTC's calculations, HTC respectfully asks the Court to enter final judgment in this matter.

III.     **HTC's Calculation of Fees and Costs Is Based on the Court's Order and Is Consistent with the Briefing on Attorneys' Fees and Costs**

The remaining dispute over the calculation of fees and costs is limited to four issues: (1) fees from May 2009 through May 2014, (2) fees from June 2014 through the present, (3) costs, and (4) pre-judgment interest. HTC addresses each of these calculations separately.

A.     **HTC Correctly Calculates Fees and Costs from May 2009 through May 2014, But Is Willing to Compromise to Narrow the Issues for the Court**

HTC and Niro have significantly narrowed the dispute between the parties with respect to the attorneys' fees HTC incurred from May 2009 through May 2014. Specifically, with Niro's

latest recalculation on March 11, it calculates the fees for this period at $3,286,428.62,[1] while

HTC calculates fees at $3,312,995.82. (Exs. 1, 15.) Thus, the parties are only $26,567.20 apart.

Given this relatively small difference between the parties, and to conserve judicial resources,

HTC is willing to compromise and use Niro's calculation. Thus, HTC is entitled to attorneys'

fees of $3,286,428.62 for the period from when IW and Niro first filed the case through the end

of May 2014.

### B. HTC Is Entitled to Fees and Costs from June 2014 Forward

As the Court stated in its Order, HTC has continued to incur fees and costs since the

Local Rule 54.3 process began in June 2014. Niro calculates these fees at $127,645.60, which is

$124,740.09 less than HTC's calculated fees. HTC incurred fees and costs related to briefing

attorneys' fees against Niro, complying with Local Rule 54.3, briefing the adverse inference

motion, opposing Niro's motion to reconsider, trying to narrow the issues related to the

application of the Court's Order, and attempting to reach settlement. HTC could not have

included these fees in its prior request, given the Local Rule 54.3 deadlines and briefing

schedule.[2] As demonstrated in HTC's invoices (Ex. 2), HTC seeks the following reasonable fees

for time from June 2014 through March 2015:

---

[1] Niro misstates its total as $3,286,142, which is not the sum of the amounts it lists.

[2] HTC included interim billing statements with its original fees motion as a basis for the fees incurred from June 2014 through September 10, 2014. HTC now includes its final billing statements corresponding to June 2014 through March 2014.

| Name | Rate | Hours | Total Fees |
|------|------|-------|------------|
| Bader | $497.00 | 61.75 | $30,689.75 |
| Buccigross | $497.00 | 63.00 | $31,311.00 |
| Graveline | $497.00 | 18.25 | $9,070.25 |
| Korniczky, P. | $497.00 | 22.30 | $11,083.10 |
| Korniczky, S. | $497.00 | 73.50 | $36,529.50 |
| Mueller | $365.00 | 237.00 | $86,505.00 |
| Bond | $163.61 | 26.75 | $4,376.57 |
| Erickson | $163.61 | 6.10 | $998.02 |
| Grauer | $135.00 | 13.50 | $1,822.50 |
| Total | | | $212,385.69 |

HTC bases its calculations upon the rates that the Court previously set in its January 8 Order. HTC has also attempted to minimize additional fees by having the attorney with the lowest billing rate, Matthew Mueller, perform the most work. Finally, HTC seeks an additional $40,000 as its conservative estimate of fees it will incur through entry of judgment (i.e., for the work in preparing this motion, the reply that will be required, and for attending the status hearing). In total, HTC is entitled to $252,385.69 in additional fees since June 2014.[3]

### C.     HTC Accurately Calculates Costs

In calculating the total costs due, HTC started with the total costs sought (both taxable and non-taxable) and deducted from this amount the costs that the Court's Order disallowed or

---

[3] HTC reserves the right to seek additional fees for the time and expense necessary to enforce a judgment, should Niro and IW refuse to voluntarily make payment, and for any fees and costs associate with appeal.

reduced. (Ex. 3.) HTC originally requested $551,756.28 in taxable and non-taxable costs. Pursuant to the Court's Order, HTC reduced this amount by $49,635.32, for total costs due of $502,120.96. Niro improperly attempts to limit HTC's total costs to $193,107.44. Thus, the parties are $309,013.52 apart in their calculations.

The Court indicated that it would disallow costs for more than two attorneys at any deposition. (Dkt. 343 at 24.) However, this did not factor into the calculation because there were no instances where HTC incurred costs for more than two attorneys traveling for a single deposition. The Court disallowed $9,460.08 in expenses for first-class airfare. (Dkt. 343 at 24; Ex. 3.) Although HTC would be entitled to the equivalent lower-tier airfare for these trips, HTC has conservatively deducted the full amount from costs. (Ex. 3 at lines 398–402.)

For transcripts, the Court limited costs to $4.85 per page plus $110 for a half-day or $220 for a full-day court reporter. (Dkt. 343 at 25.) The Court disallowed deposition costs for Livenote, rough drafts, exhibits, expediting fees, videotaping, and deposition interpreters, except the Court allowed expediting fees for the John Love deposition and allowed videotaping for the Tendler deposition. (*Id.* at 25–26.) These deductions total $29,133. (Ex. 3 at lines 406–408.)

For service of process, the Court disallowed $617.50 in rush fees and $265.50 for unsuccessful service. (Dkt. 343 at 26–27.) HTC deducted these costs. (Ex. 3 at lines 409–410.) In addition, the Court allowed $14,058.60 for in-house copying. (Dkt. 343 at 27.) HTC incurred an additional $179.45 in copying expenses prior to the Bill of Costs, but has deducted this amount. (Ex. 3 at line 415.) The Court allowed $31,599.32 for conversion and bates labeling of documents. (Dkt. 343 at 27.) This is $1,687.50 less than what HTC actually incurred, so HTC deducted this amount. (Ex. 3 at line 411.)

The Court limited hotel accommodations for the Smithsonian employees and expert witness to $242 per night and disallowed the limousine costs to transport the Smithsonian

employees from the airport. (Dkt. 343 at 28.) The cost difference for the cost of the hotel rooms is $2,452.19, which HTC deducted. (Ex. 3 at lines 412–413.) HTC estimates the taxi fare for two persons at $55 from the airport and has therefore deducted $118.68 from the costs for the limousine ride. (*Id.* at line 414.) Based on these deductions,[4] HTC is entitled to $502,120.96 in costs.

### D. HTC Is Entitled to Pre-Judgment Interest

The Court awarded HTC pre-judgment interest on its costs. (Dkt. 343 at 19.) HTC calculated this interest, compounding monthly. HTC used the Prime Rate for interest, which has remained at 3.25% since prior to May 2009. Taking a conservative approach to comply with the Court's Order, HTC averred not to calculate interest on items for which the Court did not allow or where the Court substantially reduced HTC's costs. (*See, e.g.,* Ex. 3 at lines 117, 135–136.) The total pre-judgment interest for costs through April 2015 is $54,978.88.[5] Assuming the Court enters judgment in June 2015, the amount will increase to $57,951.13.

### IV. Niro's Calculation of Fees and Costs Is Inconsistent With the Court's Order

HTC has applied the Court's Order faithfully to determine an accurate calculation of fees and costs. In contrast, Niro's calculations are inconsistent with the Court's Order in many respects. These fundamental errors have lead Niro to artificially reduce the fees and costs due to HTC.

---

[4] HTC previously agreed to withdraw $5,900.23 for various expenses. (Dkt. 329 at p. 13 n.5; Dkt. 340 at pp. 13–14.) HTC has deducted these amounts from its costs calculation. (Ex. 3 at lines 396–397.)

[5] HTC used the Excel formula (Cost*EFFECT(EFFECT(0.0325,12)*(Time),(Time))) to calculate interest, where "Cost" equals the cost for which interest is calculated, "Time" equals the years and months since the expense, "0.0325" equals the Prime Rate, and "12" equals the frequency of compounding per year.

First, Niro fails to include the fees and costs HTC has incurred since September 2014, despite the Court Order stating that HTC would receive its fees and costs for this period. (Dkt. 343 at 14.) Niro has conceded that it did not calculate any fees and costs that have occurred since September 2014. (Ex. 15 at 3.) Thus, Niro has failed to account for the fees HTC incurred to: (1) prepare HTC's reply in support of its fees motion (Dkt. 340), (2) calculate fees and costs under the Court's Order, (3) attempt to negotiate a settlement, (4) prepare for and attend hearings based on the Court's Order, (5) oppose Niro's Motion to Reconsider, which Niro withdrew after HTC's reply (Dkts. 357–361), and (6) prepare this motion for entry of judgment. HTC is entitled to these fees and costs.

Second, Niro improperly excludes numerous costs awarded by the Court. (*Compare* Dkt. 343 at 24–28, *with* Ex. 15 at 4–5.) Prior to the Court's Order, Niro conceded that HTC is entitled to $259,372.11 in non-taxable costs. (Dkt. 341 at pp. 12–13, 15.) Accordingly, after applying the Court's Order, non-taxable costs should be ***greater*** than $259,372.11. Remarkably, however, Niro now calculates HTC's non-taxable costs at only $89,310.86. (Ex. 15 at 4–5.) Niro has failed to make a good-faith calculation.

Niro also improperly deducts costs based on new objections that it failed to raise in its prior briefing and that are not found in the Court's Order. In its prior briefing, Niro raised 30 specific objections to non-taxable costs (totaling $44,201.45). (Dkt. 341-1 at 40; Dkt. 340 at p. 13.) Niro is belatedly attempting to raise a new objection for allegedly incomplete receipts. (*Compare* Ex. 15 at 4, *with* Dkt. 343 at 24–28.)

Niro's calculations are fundamentally flawed because it has improperly eliminated nearly $300,000 in costs without explanation. Niro's baseline for its calculation of non-taxable costs starts at $113,813.34, despite the fact that HTC sought over $400,000 in non-taxable costs.

(*Compare* Ex. 15 at 3–4, *with* Dkt. 329 at p. 13.)  The Court should reject Niro's clearly

erroneous cost calculations.

Finally, Niro fails to calculate pre-judgment interest on costs despite the Court's Order

granting pre-judgment interest.  (Dkt. 343 at 18–19.)  Niro admits as much.  (Ex. 15.)  The Court

should reject Niro's attempts to circumvent the Court's Order and adopt HTC's calculations for

entry of judgment.

## V.      Henderson Should Be Personally Liable for Fees and Costs Against IW

The Court should pierce the corporate veil to hold Henderson personally liable for IW's

debts.  IW is a Texas corporation, so the Court should apply Texas law when assessing whether

to pierce the corporate veil.  *Judson Atkinson Candies v. Latini-Hohberger*, 529 F.3d 371, 378

(7th Cir. 2008).  Texas recognizes three "broad" theories under which a court may pierce the

corporate veil:  (1) the alter ego doctrine, (2) where the corporation is used for an illegal purpose,

and (3) where the corporation is used to perpetrate a fraud.  *SEC v. Res. Dev. Int'l*, 487 F.3d 295,

302–03 (5th Cir. 2007).  At a minimum, the Court can rely on an alter ego theory or a fraud

theory to hold Henderson personally liable for HTC's fees and costs due under the Court's

Order.

### A.      Henderson and IW Are Alter Egos

"Under Texas law, 'alter ego applies when there is such unity between corporation and

individual that the separateness of the corporation has ceased and holding only the corporation

liable would result in injustice.'"  *Bollore SA v. Import Warehouse Inc.*, 448 F.3d 317, 325 (5th

Cir. 2006) (quoting *Castleberry v. Branscum*, 721 S.W.2d 270, 272 (Tex. 1986)).  Texas courts

take "a flexible fact-specific approach focusing on equity in determining whether the corporate

veil should be pierced."  *Sparling v. Doyle*, No. EP-13-CV-00323, 2014 U.S. LEXIS 151113, at

*20 (W.D. Tex. Oct. 23, 2014) (quoting *Castleberry*, 721 S.W.2d at 273)).  The Court should

weigh the following factors to determine whether to pierce the corporate veil: (1) the degree to which IW followed corporate formalities, (2) comingling of Henderson and IW assets, (3) the amount of financial interest, ownership, and control Henderson exerted over IW, and (4) whether Henderson used IW for personal purposes. *SEC*, 487 F.3d at 302. Although all of these factors are potentially relevant to piercing the corporate veil, "no single factor is sufficient or necessary." *Sparling*, 2014 U.S. LEXIS 151113, at *18 (citing *Castleberry*, 721 S.W.2d at 273). However, here, all of the factors heavily weigh in favor of piercing the corporate veil.

### 1.    IW Failed to Follow Corporate Formalities

IW did not follow any corporate formalities. IW's alleged President, Mr. William Grant, never took a salary and, remarkably, was unaware that IW was filing lawsuits for patent infringement until his deposition in 2011—roughly three years after IW filed its first infringement lawsuit. (Ex. 16 at 65:2–25, 67:25–68:5, 68:15–16, 74:2–75:7, 77:1–10.) For at least two years, from 2009–2011, IW's President never even communicated with Henderson about IW. (*Id.* at 71:14–20, 72:6–8.) The only activity IW engaged in was litigation. Yet, for years, IW's alleged President was completely unaware that the company was involved in litigation. The most basic corporate governance (i.e., communicating with the company president) did not take place. Moreover, the corporate documents IW produced in this litigation fail to show any formal corporate meetings during the course of this litigation.

### 2.    IW and Henderson Comingled Assets

IW and Henderson comingled assets, which justifies piercing the corporate veil. Specifically, Henderson and IW entered into multiple licenses such that the parties would pay Henderson and IW up to a combined $4.5 million. (Ex. 17 at 3; Ex. 18 at 5–6.) These agreements call for single payments to both IW and Henderson with no provision for the division

of assets.  Notwithstanding any other financial improprieties, these licenses demonstrate that

Henderson treated IW's assets as indistinct from his own.

### 3.    Henderson Had Complete Financial and Managerial Control Over IW

Henderson exerted complete and exclusive control of IW throughout this litigation.  IW's

President, Mr. Grant, was not even aware of the litigation.  Moreover, there were no other active

employees in IW.  (Ex. 16 at 78:22–79:8.)  For example, IW's former alleged Vice President,

Mr. Kenneth Hill, did not know he was Vice President of IW (or that he ceased being the Vice

President) and had never done any work for IW.  (Ex. 19 at 37:13–24, 39:25–40:18, 43:1–44:9.)

Finally, essentially all of IW's profits (i.e., 98%) went directly to Henderson, which

demonstrates that Henderson not only had complete control over IW, but also controlled nearly

all of its finances.  (Ex. 20 at 1–3.)

### 4.    Henderson Engaged in Self-Dealing and Used IW as His Personal Patent Collection Company

Henderson treated IW as his personal company for his personal benefit.  In an agreement

in which Henderson was the signatory for both parties (i.e., an agreement with himself),

Henderson funneled 98% of IW's profits to his own personal use.  (Ex. 20 at 1–3.)  Henderson

also signed license agreements on behalf of IW, but directed the payments to himself instead of

the corporation.  (Ex. 21 (paying Henderson $3 million); Ex. 22 (paying Henderson $2.5

million); Ex. 23 (paying Henderson $1 million); *see also* Exs. 17–18 (comingling payments to

Henderson and IW).)  IW collected approximately $25 million in licensing its patents, which it

split 60-40 with Niro.  (Dkt. 343 at 6; Ex. 7 at Ex. A, p. 4.)  That left IW with $15 million, of

which $14.7 million was owed directly to Henderson.  By design, Henderson was able to pilfer

IW's assets in a manner that now leaves IW unable to pay HTC's fees and costs.  Thus, the Court

should hold Henderson personally liable and pierce the corporate veil.

### B.     Henderson Used IW to Perpetrate Fraud

Alternatively, the Court should pierce IW's corporate veil and make Henderson personally liable because Henderson used IW to perpetrate fraud.  *See SEC*, 487 F.3d at 302–03. Henderson incorporated IW and sold his patents to IW on February 22, 2007, less than two weeks after his email confession to Tendler that he had submitted false declarations to the PTO, which he knew would render his patents unenforceable.  (Ex. 20.)  Despite knowing that his patents were unenforceable, Henderson used IW to enforce his patents against the entire wireless industry.  The Court and Judge Pallmeyer have both held that IW committed fraud while litigating its patents.  (Dkts. 291, 343; *Intellect Wireless, Inc. v. Sharp Corp.*, 45 F. Supp. 3d 839 (N.D. Ill. 2014).)  Henderson, through IW, continued to fraudulently prosecute the patents at the PTO from February 2007 through 2013, including submitting the Smithsonian press release. (Dkt. 217 at 27.)  Without the fraud Henderson and IW perpetrated, the PTO would never have issued the patents on which IW based its litigation.  *Intellect*, 45 F. Supp. 3d at 851 ("had Plaintiff not filed false declarations with the PTO, Plaintiff likely would not have obtained the patents at issue nor sued").  Thus, Henderson used IW to perpetrate fraud, which justifies the Court piercing the corporate veil to hold Henderson personally liable for IW's debts.

## VI.   Conclusion

The Court should enter judgment against Niro, IW, and Henderson jointly and severally for $4,098,886.40, which is in accordance with the Court's Order.

Dated:  April 30, 2015

Respectfully submitted,

By:  /s/ Martin R. Bader
    Stephen S. Korniczky
    Martin R. Bader
    Matthew M. Mueller
    SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
    12275 El Camino Real, Suite 200
    San Diego, CA  92130
    Tel:    (858) 720-8900
    Fax:    (858) 509-3691
    skorniczky@sheppardmullin.com
    mbader@sheppardmullin.com
    mmueller@sheppardmullin.com

    Paul J. Korniczky
    LEYDIG, VOIT & MAYER, LTD.
    Two Prudential Plaza, Suite 4900
    180 N. Stetson Avenue
    Chicago, IL  60601-6731
    Tel:    (312) 616-5600
    Fax:    (312) 616-5700
    pkorniczky@leydig.com

    Attorneys for Defendants and Counter-Claimants
    HTC CORPORATION and HTC AMERICA, INC.

**CERTIFICATE OF SERVICE**

      The undersigned hereby certifies that a true and correct copy of the foregoing document was served through the Court's ECF filing system on attorneys of record in the case.


Date:   April 30, 2015            /s/ Martin R. Bader